IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs February 23, 2022

**STATE OF TENNESSEE v. KENNETH COX**

**Appeal from the Criminal Court for Knox County**
**No. 111617   Steven Wayne Sword, Judge**

_____

**No. E2021-00621-CCA-R3-CD**

_____

Defendant, Kenneth Cox, was acquitted of premeditated murder and convicted by a Knox County jury of two counts of especially aggravated robbery and three counts of the lesser included offense of criminally negligent homicide.  The trial court properly merged Defendant's convictions and imposed an effective sentence of 38 years' incarceration. Defendant appeals, asserting that the trial court erred by denying his motion to suppress statements he made to police following his invocation of his right to counsel and that the evidence at trial was insufficient to support his convictions.  Having reviewed the entire record and the parties' briefs, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Trial Court Affirmed**

TIMOTHY L. EASTER, J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER and JOHN W. CAMPBELL, JJ., joined.

J. Lidell Kirk (on appeal); Christopher (Kit) Rodgers (at trial), Knoxville, Tennessee, for the appellant, Kenneth Lamont Cox.

Herbert H. Slatery III, Attorney General and Reporter; Kayleigh Butterfield, Assistant Attorney General; Charme P. Allen, District Attorney General; and Phillip Morton and Ta Kisha M. Fitzgerald, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

*Evidence at Trial*

Defendant was indicted along with co-defendant, Adam Holmes, with several offenses that resulted in the June 8, 2017, death of the victim, Darryl Singleton.  After

successfully moving for a severance from the co-defendant, Defendant proceeded to a jury trial in April of 2019.

Vanessa Teasley, a volunteer at the Baptist Center in Western Heights, testified that on June 8, 2017, she was sorting a delivery of food when she heard a "pop." She looked across the street and saw the victim "leaned over in the car" with a gunshot wound to the head. She saw two men exit the vehicle and run. Ms. Teasley testified that a "taller guy" exited the front passenger seat of the vehicle, and a "shorter guy" exited the backseat. Ms. Teasley saw the shorter man run back to the vehicle, open the driver's side door, reach over the victim, and take a duffel bag and "a big, silver gun." He handed the bag and the gun to the taller man and they both ran in the direction of "Mike's house," a neighborhood safe house. Ms. Teasley identified Defendant's co-defendant, Adam Holmes, in a photo lineup.

Kristin Brown, Holmes' girlfriend, testified that she dropped off Holmes at his mother's house in Western Heights to do laundry. A short time later, she drove back to pick up Holmes and Defendant. Holmes got in the front passenger seat, and Defendant got in the backseat.

Shawn Casey O'Brien and Laura O'Brien, emergency medical responders, arrived at the scene in an ambulance. They were instructed to park the ambulance in a "staging" area away from the crime until police cleared the scene. Mr. O'Brien testified that he saw "two black males coming quickly down the hill, one of them with a bag or a backpack, dark backpack in his hand." Mr. O'Brien saw a car pull up and stop in front of the ambulance and the two men "were walking relatively quickly and got into that car." Ms. O'Brien testified that she saw a person running from the scene. He was carrying a black duffel bag and he got into the passenger side backseat of the vehicle.

Knoxville Police Department ("KPD") Officer Brandon Wardlaw responded to a call that a person had been shot inside a vehicle in front of the Baptist Center in Western Heights. He interviewed Ms. Teasley and showed her a photo lineup. Ms. Teasley identified Holmes as the person who shot the victim. Defendant's photo was not included in the lineup.

Investigator Jeff Day of the KPD arrived at the scene with Officer Wardlaw. The victim was deceased in the driver's seat of the vehicle, a Hyundai, and the driver's side door was open. Investigator Day testified that, based on his observations, it appeared that only one bullet was fired and that it was fired from the front passenger side of the vehicle. Officers found a car title for a Caprice Classic inside the victim's car. The title indicated that the victim had purchased the car from Holmes. Police also found $6,000 cash in the victim's vehicle and a 9-millimeter shell casing under the vehicle.

Officers located Holmes, and he gave an interview to police in which he denied shooting the victim. A search of Holmes' cell phone showed that there were 16 calls between Defendant and Holmes on the day before the shooting and seven calls between them on the morning of the shooting.

Investigator Day interviewed Defendant on July 9, 2017. Defendant initially denied being present at the time of the shooting, stating that he "heard about it on Facebook." Defendant ultimately admitted to being in the car with the victim and Holmes but stated that he ran away before the victim was shot. He also admitted that he grabbed a black backpack from the car before fleeing and that Ms. Brown picked him and Holmes up near the scene of the crime. A video recording of the interview was played for the jury.

Police never recovered a black duffel bag. Police recovered a black Glock .22 in Ms. Brown's vehicle at the time of Holmes' arrest, but it was not the gun used to shoot the victim.

Dr. William Oliver, a medical examiner, conducted an autopsy of the victim. Dr. Oliver testified that the victim was shot from an "indeterminate" range. A bullet entered near the victim's right temple, transected the victim's brain stem, and lodged in the victim's skull on the left side of his head. Dr. Oliver recovered the bullet, a 9-millimeter, from the victim's skull.

Defendant did not testify or present any other proof at trial. Following the conclusion of the proof, the jury found Defendant guilty of both counts of especially aggravated robbery and three counts of criminally negligent homicide, a lesser included offense of felony murder. The trial court properly merged Defendant's convictions and sentenced him to 38 years' imprisonment. Defendant timely appealed.

### *Analysis*

On appeal, Defendant argues (1) that he made an unequivocal request for counsel during his interrogation and that the trial court erred in denying his motion to suppress the statements he made to police; and (2) that the evidence was insufficient to support his convictions.

### *Motion to Suppress*

Defendant contends that the trial court erred in denying his motion to suppress his statement to police. He asserts that he unequivocally invoked his right to counsel when he told Investigator Cook that he would "rather have a lawyer" and that his subsequent statement to Investigator Day should have been suppressed. The State responds that the

trial court properly denied Defendant's motion to suppress because Defendant's comment was not an unequivocal request for an attorney and because Defendant made the comment while discussing an unrelated robbery investigation, in which Defendant was a victim.

The only evidence presented at the hearing on Defendant's motion to suppress was the video recording of the police interview with Defendant. Therefore, our review of the question in this appeal is entirely de novo, with no deference to the trial court's factual findings, because the trial court's factual determinations were based wholly upon the video evidence, which is included in the record on appeal. *See State v. Climer*, 400 S.W.3d 537, 556 (Tenn. 2013) (citing *State v. Turner*, 305 S.W.3d 508, 514 (Tenn. 2010) (applying de novo review because the trial court's determination was based on video evidence included in the appellate record)).

Police arrested Defendant on an outstanding parole violation warrant. Investigator Robert Cook asked Defendant to read a *Miranda* waiver of rights form aloud. After reading his rights, Defendant signed the form. Investigator Cook told Defendant that, after their conversation, another investigator wanted to question him about a separate offense. Investigator Cook's conversation with Defendant involved an incident where Defendant alleged he was the victim of a robbery. Defendant and Investigator Cook spoke for approximately 20 minutes about the alleged robbery before Investigator Cook asked Defendant whether he could identify the person who robbed him in a lineup. Defendant replied that he would "rather have a lawyer and everything with [him] in that situation." Defendant expressed concern about being labeled a "snitch." Defendant stated again that he would "rather have a lawyer" before identifying the person who robbed him and stated "my whole thing is the snitch thing." Defendant worried that he might be incarcerated with the person he identified.

Investigator Cook told Defendant that he was going to look for his partner and left the room. Four minutes later, he returned with Investigator Day. Investigator Day knew Defendant from having been a school resource officer at Defendant's high school. Investigator Day told Defendant that he had something "serious" to discuss with him. He informed Defendant of the victim's death and Holmes' involvement. Defendant spoke to Investigator Day about the circumstances surrounding the victim's death for nearly an hour. Toward the end of the interview, Defendant told Investigatory Day, "If I had anything, like physically to do with that sh[**], dude, I would have said 'I need a lawyer. I don't want to talk to you.'"

Both the state and federal constitutions guarantee an accused the right to the assistance of counsel and the right against self-incrimination. The Fifth Amendment to the United States Constitution guarantees that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." Article I, section 9 of the Tennessee

- 4 -

Constitution similarly provides that "in all criminal prosecutions, the accused . . . shall not be compelled to give evidence against himself." Statements made during the course of a custodial police interrogation are inadmissible at trial unless the State establishes that the defendant was advised of his right to remain silent and his right to counsel and that the defendant then waived those rights. *Miranda v. Arizona*, 384 U.S. 436, 471-75 (1966); *see also Dickerson v. United States*, 530 U.S. 428, 444 (2000); *Stansbury v. California*, 511 U.S. 318, 322 (1994). A defendant's rights to counsel and to remain silent may be waived as long as the waiver is made voluntarily, knowingly, and intelligently. *Miranda*, 384 U.S. at 478; *State v. Middlebrooks*, 840 S.W.2d 317, 326 (Tenn. 1992). However, during the course of an interrogation, if the defendant clearly and unequivocally invokes either his right to silence or his right to counsel, the interrogation must immediately cease. *See Berghuis v. Thompkins*, 560 U.S. 370, 381 (2010); *Davis v. United States*, 512 U.S. 452, 459 (1994). "The fundamental purpose of the Court's decision in *Miranda* was 'to assure that the individual's right to choose between speech and silence remains unfettered throughout the interrogation process.'" *Connecticut v. Barrett*, 479 U.S. 523, 528 (1987) (emphasis omitted) (quoting *Miranda*, 384 U.S. at 469).

Defendant acknowledges that he voluntarily waived his *Miranda* rights. He argues, however, that he invoked his right to counsel and that police continued to question him. Once a suspect unequivocally invokes his right against self-incrimination, "the admissibility of statements obtained after the person in custody has decided to remain silent depends under *Miranda* on whether his 'right to cut off questioning' was 'scrupulously honored.'" *Michigan v. Mosley*, 423 U.S. 96, 104 (1975) (quoting *Miranda*, 384 U.S. at 474, 479). If an accused makes an unequivocal request for an attorney, all interrogation must cease "unless the accused himself initiates further communication, exchanges, or conversations with the police." *Edwards v. Arizona*, 451 U.S. 477, 484-85 (1981). "Invocation of the *Miranda* right to counsel 'requires, at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney.'" *Davis*, 512 U.S. at 459 (quoting *McNeil v. Wisconsin*, 501 U.S. 171, 178 (1991)); *see also State v. Huddleston*, 924 S.W.2d 666, 669 (Tenn. 1996). "[I]f a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel," questioning need not cease, nor must an officer clarify the suspect's intention regarding invocation of the right to counsel. *Davis*, 512 U.S. at 459, 459 (emphasis in original).

Whether or not an accused has actually invoked his right to counsel during interrogation is an "objective inquiry." *Davis*, 512 U.S. at 459. "The accused 'must articulate his desire to have counsel present sufficiently clearly that a reasonable [police] officer . . . would understand the statement to be a request for an attorney.'" *State v. Saylor*, 117 S.W.3d 239, 246 (Tenn. 2003) (citing *Huddleston*, 924 S.W.2d at 670). The

investigating officers may continue to question an accused if the accused's reference to counsel is ambiguous or equivocal. *Id*.

Based on our review of the video-recorded interrogation, Defendant did not unequivocally and unambiguously invoke his right to counsel. Defendant's statement that he would "rather have a lawyer" present for a photo lineup identification in connection with an incident, unrelated to the victim's death in this case, in which Defendant alleged he was the victim of a robbery does not constitute an unequivocal request for counsel. Defendant spoke freely with Investigator Cook about the unrelated robbery before making the statement that he would "rather have a lawyer . . . in that situation," referring specifically to viewing a photo lineup to identify the person who robbed him. Defendant then explained that he was worried about being labeled a "snitch," which could put him at risk of being in physical danger in jail. Following a break, Defendant spoke freely and at length to Investigator Day about the incident in this case and concluded the conversation by affirming that his decision to speak to investigators was voluntary by stating that if he had anything to do with the victim's death, he would have requested a lawyer during his interview.

We conclude that the trial court did not err by not suppressing Defendant's statement. Defendant is not entitled to relief on this issue.

*Sufficiency of the Evidence*

Defendant argues that the evidence was insufficient to support his convictions. Specifically, Defendant argues that the State failed to prove that he was criminally responsible for the offenses. The State asserts that the evidence was sufficient to support the convictions.

On appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn from that evidence. *State v. Davis*, 354 S.W.3d 718, 729 (Tenn. 2011) (citing *State v. Majors*, 318 S.W.3d 850, 857 (Tenn. 2010)). When a defendant challenges the sufficiency of the evidence, the standard of review applied by this Court is "whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). Similarly, Rule 13(e) of the Tennessee Rules of Appellate Procedure states, "Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the finding by the trier of fact of guilt beyond a reasonable doubt." Guilt may be found beyond a reasonable doubt where there is direct evidence, circumstantial evidence, or a combination of the two. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990) (citing *State v. Brown*, 551 S.W.2d 329, 331 (Tenn. 1977);

*Farmer v. State*, 343 S.W.2d 895, 897 (Tenn. 1961)). The standard of review for sufficiency of the evidence "'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn.2009)). The jury as the trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and reconcile all conflicts in the evidence. *State v. Campbell*, 245 S.W.3d 331, 335 (Tenn. 2008) (citing *Byrge v. State*, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978)). Moreover, the jury determines the weight to be given to circumstantial evidence and the inferences to be drawn from this evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence are questions primarily for the jury. *Dorantes*, 331 S.W.3d at 379 (citing *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006)). When considering the sufficiency of the evidence, this Court shall not reweigh the evidence or substitute its inferences for those drawn by the trier of fact. *Id.*

"A person is criminally responsible as a party to an offense, if the offense is committed by the person's own conduct, by the conduct of another for which the person is criminally responsible, or by both." T.C.A. § 39-11-401(a). An individual is criminally responsible for the conduct of another person if, "[a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense[.]" *Id*. § 39-11-402(2).

The trial court instructed the jury regarding criminal responsibility as follows:

> The defendant is criminally responsible as a party to the offenses . . . if the offenses were committed by the defendant's own conduct, by the conduct of another for which the defendant is criminally responsible, or by both. Each party to the offense may be charged with the commission of the offense.

> The defendant is criminally responsible for an offense committed by the conduct of another if, acting with the intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the defendant solicits, directs, aids, or attempts to aid another person to commit the offense.

> A defendant who is criminally responsible for an offense may be found guilty not only of that offense, but also for any other offense or offenses committed by another, if you find beyond a reasonable doubt that the other offense or offenses committed were natural and probable consequences of the original offense for which the defendant is found

criminally responsible and that the elements of the other offense or offenses that accompanied the original offense have been proven beyond a reasonable doubt.

. . . .

To find a defendant criminally responsible for the acts of another, it is not necessary that you find the defendant was present or that the defendant took a physical part in the crime; encouragement of the principal offender is sufficient. However, mere presence during the commission of the offense is not sufficient to support a conviction.

Before you find the defendant guilty of being criminally responsible for said offenses committed by the conduct of another, you must find that all the essential elements of said offenses have been proven by the state beyond a reasonable doubt.

A person commits especially aggravated robbery when he or she intentionally or knowingly commits a theft of property by violence or by putting the victim in fear, and he or she accomplishes the act with a deadly weapon or the victim suffers serious bodily injury. T.C.A. § 39-13-401, -403.

A criminally negligent homicide occurs where "[c]riminally negligent conduct . . . results in death." T.C.A. § 39-13-212(a). In order to support a conviction for criminally negligent homicide, the State must establish beyond a reasonable doubt the following elements: (1) criminally negligent conduct on the part of the defendant; (2) proximate causation; and (3) the victim's death. *State v. Jones*, 151 S.W.3d 494, 499 (Tenn. 2004); *State v. Farner*, 66 S.W.3d 188, 199 (Tenn. 2001).

Defendant acknowledges that there was evidence presented that Defendant was present at the time of the offense; however, Defendant asserts that "the evidence presented at trial does not establish the extent of [Defendant]'s involvement in either the homicide or the robbery[.]"

Based on the evidence presented at trial, the jury could reasonably conclude that Defendant was criminally responsible for the offenses. Phone records admitted at the trial showed that Defendant and Holmes were in frequent contact on both the day preceding the shooting and the day of the shooting. Holmes also contacted the victim several times. A witness testified that she heard a gunshot and then saw Holmes and another man exit the victim's car. She saw the second man reach over the victim and retrieve a silver gun and a black bag before fleeing. Defendant admitted to police that he was in the car with Holmes

and the victim and that he took a backpack from the victim's car. Defendant told Investigator Cook that "we was robbing him, and I ain't got no problem saying this was what was going on. But I didn't shoot." Defendant should have been aware that robbing the victim at gunpoint could result in the victim's death.

We conclude that the evidence at trial was sufficient to find that Defendant was criminally responsible for the especially aggravated robbery and criminally negligent homicide of the victim. Defendant is not entitled to relief.

CONCLUSION

For the foregoing reasons, we affirm the judgments of the trial court.

_____
TIMOTHY L. EASTER, JUDGE